IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SUSAN GIDNEY                                                    PLAINTIFF

v.                              Case No. 5:13-CV-05061

NORTHWEST ARKANSAS COMMUNITY
COLLEGE BY AND THROUGH THE BOARD
OF TRUSTEES; REBECCA PANEITZ, President,
in her official and personal capacities; and
WENDI CADLE, Director of Human Resources,
in her official and personal capacities                        DEFENDANTS

## OPINION AND ORDER

Before the Court are Defendants Northwest Arkansas Community College ("NWACC"), Rebecca Paneitz, and Wendi Cadle's Motion for Summary Judgment (Doc. 14), Brief in Support (Doc. 15), and Statement of Facts (Doc. 16); Plaintiff Susan Gidney's Response in Opposition (Doc. 17) and Statement of Facts (Doc. 18); and Defendants' Reply (Doc. 19) and Response to Plaintiff's Statement of Facts (Doc. 20).  The Court also considered the parties' oral arguments on the Motion during a hearing conducted on May 19, 2014, as well as the parties' supplemental briefing (Docs. 33-36), provided at the Court's request.  For the reasons set forth herein, Defendants' Motion for Summary Judgment (Doc. 14) is GRANTED.

## I.    Background

Plaintiff Gidney began working at NWACC in July of 2007.  NWACC is a public, two-year community college organized under the laws of the State of Arkansas. While employed at NWACC, Gidney was deemed a "Fixed Assets Accountant"; however, the

Arkansas Department of Finance and Administration's Office of Personnel Management ("OPM") classified Gidney's position more generally as an "Accountant" for purposes of assigning her a pay grade and salary.

Gidney's accounting duties at NWACC were somewhat specialized in that she was responsible for tracking transactions involving fixed assets—or assets that retain a certain value—and facilitating the disposal of surplus property at the college.  NWACC could not dispose of any asset, fixed or not, without authorization from the State of Arkansas; therefore, in order to dispose of surplus property located on the campus of NWACC, the staff would contact Gidney, and she would oversee the disposal process.  Gidney was responsible for submitting certain forms to the State requesting authority to destroy, donate, or sell property.  Once such authority was granted, Gidney would tag the property and arrange for it to be moved or stored somewhere on campus or, in certain cases, placed on pallets and shrink-wrapped for public bidding.

During 2009, NWACC was in the process of conducting a job search for two key positions in the finance department:  controller and assistant controller. While this job search was proceeding, Gidney and several other finance department employees agreed to assume extra responsibilities outside their job descriptions in exchange for additional duty pay.  Gidney understood from the outset that this additional duty pay would only continue until NWACC filled the vacant controller and assistant controller positions.

On July 1, 2010, a statewide freeze on employee compensation went into effect. Despite the salary freeze, NWACC continued to make additional duty payments to Gidney and several other finance department workers, as the controller and assistant controller positions had not yet been filled.  Several months later, in October of 2010, OPM

conducted an investigation into the pay practices at NWACC.  Through the course of this investigation, OPM identified all the additional duty payments that Gidney and other "classified" employees like herself had received.[1]   OPM then directed NWACC to stop making these additional duty payments. (Doc. 15-9).

Following OPM's decision, Gidney and a co-worker met with Defendant Rebecca Paneitz, who was then the President of NWACC, about restoring their additional duty pay. Gidney admits that Paneitz and several other members of NWACC's leadership worked with her to submit an amended job description to OPM reflecting her actual job duties and justifying a higher base salary.  Despite these efforts, however, OPM refused to make any changes to Gidney's job description or salary.

OPM's response provoked Gidney to write a letter to the Arkansas Attorney General on April 1, 2011, questioning the legality of OPM's actions and asserting that her additional duty pay was contractually agreed-to by NWACC, as reflected in a "signed employment letter for fiscal year 2011 that states my wages are $41,119 which includes the 10% additional duty pay." (Doc. 15-13, p. 2).  Also in her letter to the Attorney General, she inquired "as an Arkansas taxpayer . . . why NWACC had no management oversight in the accounting department for three years" and commented that "[i]f the college violated state policy they should be penalized[,] not the employees."  *Id.* at p. 3.

Shortly after sending this letter, Gidney made Freedom of Information Act ("FOIA") requests to NWACC's Chief Financial Officer, Marty Parsons, in April and May of 2011,

---

[1] "Classified" positions like that of "Accountant" are designated by the State of Arkansas and governed by the rules and regulations promulgated by OPM.  Such positions are standardized throughout the state system with particular class titles, pay grades, and defined duties and responsibilities.

demanding an organizational chart for all positions that reported to Parsons, including salaries and pay grades for more than 20 employees, as well as specific documentation as to these employees' wage histories, years employed in higher education, professional degrees, and merit raises. (Docs. 27, 29, 30).

Sometime in late 2011, Chuck Ramseyer, the Vice President for Finance and Treasury Services at NWACC, assigned Gidney the task of disposing of surplus assets that had accumulated over the years. These assets included old computer equipment located in storage rooms in a five-level parking garage on campus.

On January 26, 2012, Ramseyer asked Gidney for her "estimated timeline . . . on completing this project," and advised that the maintenance department would help palletize the items for disposal. (Doc. 15-15). On February 17, 2012, Ramseyer requested an update from Gidney regarding moving the inventory out of garage storage. He concluded his email by asking Gidney to "[p]lease provide me with reasonable deadlines for completion or I will set them." (Doc. 15-16). Gidney then responded in writing with an explanation of what she planned to do with the inventory, but did not propose a deadline for project completion. *Id.* Ramseyer replied, "That is fine but I still need to know <u>when</u> this will be done." *Id.* (emphasis in original). Gidney responded that she did not know when the project could be done, and that certain timing was out of her control. *Id.* The next email from Ramseyer to Gidney stated, "Per our discussion Friday you said you needed 5 months to process all of the disposals. That puts our completion date at July 31, 2012. With that goal in mind I would like updates at the end of each month until the task is completed." *Id.*

-4-

Several weeks later, Casey Wilhelm, the newly-hired Controller for NWACC, sent Gidney an email dated March 26, 2012, instructing Gidney to dispose of the parking garage assets by the end of the fiscal year, June 30, 2012.  (Doc. 15-18).  Thereafter, on April 26, 2012, Wilhelm reminded Gidney in a second email that she wanted "all the old equipment gone by the close of the FY12 year" and directed Gidney to provide "weekly updates on how the progress is going."  (Doc. 15-19).  Gidney responded, "I will work on palletizing the excess equipment . . . how fast we can get rid of it depends on Marketing and Redistribution and the bidding process.  That's out of my hands."  (Doc. 15-20).

Wilhelm took Gidney to lunch in May of 2012 and again discussed management's expectations regarding the disposal of the old equipment in the parking garage.  The two women discussed various possibilities for expediting the disposal process.  Meanwhile, Ramseyer fielded inquiries from NWACC management regarding the status of the disposal project, as reflected in an email dated May 29, 2012, in which Ramseyer informed Director of Operations Jack Thompson that "Sue [Gidney] was given until July 31, 2012 to complete this task per her own timeline."[2]  (Doc. 15-21).  Ramseyer also commented in the same email, "As much as I dislike the option, we may have to rent storage space until Sue gets the task completed or other appropriate action is taken."  *Id.*

On June 6, 2012, Parsons began asking Ramseyer about the status of the disposal project for the parking garage.  *Id.*  Then on June 7, 2012, Wilhelm wrote to Gidney asking

---

[2] It appears that as of May 29, 2012, Ramseyer was unaware that Gidney's supervisor, Wilhelm, had moved up the deadline for the parking garage project to June 30, 2012. Ramseyer had set a July 31, 2012 deadline when he was Gidney's supervisor.  When Wilhelm was hired in March of 2012, Gidney began reporting to her, and Wilhelm changed the project deadline to June 30, 2012.

again for a timeline on cleaning out "all the old equipment stored in various areas in the parking garage." (Doc. 15-22). Thereafter, Wilhelm followed up on June 27, 2012, with an email titled "Old Fixed Assets it [sic] the Parking Garage" and advised that she "really need[ed] to know if any progress has been made on the old stuff in the parking garage." (Doc. 15-23). In response, Gidney wrote, "The parking garage has been on hold. We took two additional pallet [sic] out of IT storage. I also have been working with the science department to remove their old equipment. I still need to clean up the library equipment and distance learning before I start on the parking garage." *Id.*

Coincidentally, sometime during the month of June 2012, just as Parsons, Ramseyer, and Wilhelm were all demanding information as to the status of Gidney's disposal project, Gidney applied for a job in the information technology department at NWACC. On or about July 2, 2012, Gidney, who was then 55 years old, learned that the position she applied for had been filled by another applicant, Marie Scharfenberg, who was also 55 years old. The same day Gidney received the news that she had not secured the information technology job, she submitted a FOIA request to Defendant Wendi Cadle, NWACC's Director of Human Resources, seeking access to copies of all documents related to the hiring process for that position. Also on that same day, Gidney received a letter from NWACC confirming that her "Accountant" position in the finance department had been renewed for funding by the state legislature for the upcoming year.

Gidney claims that on July 13, 2012, she told Beverly Hill, a human resources department employee, that she was considering filing a complaint for discrimination with the Equal Employment Opportunity Commission ("EEOC"). Hill, however, denies that Gidney ever told her about an EEOC complaint. (Doc. 15-35, p. 6). Even if the Court were

-6-

to assume Gidney did tell Hill about an EEOC complaint, the recommendation to terminate Gidney's employment had been made prior to July 12, 2012, according to an affidavit submitted by Wilhelm.  *See* Doc. 15-17.  Hill confirmed in her deposition—which was not controverted by Gidney through testimony or any form of proof—that between July 10 and July 13, conversations took place between Wilhelm and Ramseyer, to which Hill was privy, regarding Gidney's recommended termination.  (Doc. 15-35, pp. 3-4).

At some point, Cadle was consulted regarding Gidney's termination, and the Attorney General's office was also consulted.  *Id.* at p. 4.  Finally, the decision to terminate Gidney was submitted for approval to Paneitz, who approved the decision.  *Id.*  Gidney was formally discharged on July 18, 2012.  The stated reason given for her removal was "misconduct; failure to complete required assigned work in a timely manner as requested by your supervisor on numerous occasions."  (Doc. 15-4).

On or about August 20, 2012, Gidney filed charges of age discrimination and retaliation with the EEOC.  After she received her right-to-sue letter, she filed the instant lawsuit on March 19, 2013, alleging the following three causes of action: (1) retaliation for opposition to discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (2) retaliation for the exercise of her rights of free speech and to petition for redress in violation of the First Amendment; and (3) the deprivation of her substantive and procedural due process rights in violation of the Fourteenth Amendment.  Gidney filed suit against three Defendants: NWACC; Rebecca Paneitz, in her official capacity as NWACC's former President,[3] and in her personal capacity; and Wendi Cadle, in her official capacity

---

[3] Paneitz has retired as President since this action was filed, and the current President of NWACC is Dr. Evelyn Jorgenson.  Accordingly, Jorgenson is automatically substituted in

as NWACC's Director of Human Resources, and in her personal capacity.

Gidney's first cause of action is against NWACC only and alleges that Gidney was terminated in retaliation for having engaged in conduct protected by the ADEA.  Her last two causes of action are brought against all Defendants pursuant to 42 U.S.C. §1983, which establishes liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."

The Court will address Gidney's claims against each Defendant in turn, starting with claims asserted against NWACC and concluding with a discussion of the official-capacity and personal-capacity claims made against Paneitz and Cadle individually.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts.  *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

---

place of Paneitz with respect to all official-capacity claims.  Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.  Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.  The court may order substitution at any time, but the absence of such an order does not affect the substitution.").

The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).

In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Plaintiff and Defendants disagree as to whether Defendants' claim of Eleventh Amendment immunity should be viewed as a jurisdictional issue—with Plaintiff bearing the burden of proof—or an affirmative defense—with Defendants bearing the burden of proof. *See* Doc. 33, pp. 1-3; Doc. 34, pp. 2-3. It does not appear that the Eighth Circuit has definitively weighed in on this particular issue, though various other circuits have. *See, e.g., Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d. Cir.

2006) (finding governmental entity invoking Eleventh Amendment immunity bears burden of proving that it qualifies as an arm of the state); *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002) (same); *Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000) (same); *Christy v. Pa. Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995) (same); *Baxter v. Vigo Cnty. Sch. Corp.*, 26 F.3d 728, 734 n.5 (7th Cir. 1994) (same); *ITSI TV Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1292 (9th Cir. 1993) (same).

Considering that six Courts of Appeal addressing this issue have found in favor of treating it as an affirmative defense, this Court, for purposes of the instant Motion for Summary Judgment, will also treat NWACC's immunity argument as an affirmative defense. This means that NWACC is required on summary judgment to show that there is no genuine issue of material fact in dispute as to its entitlement to immunity.

## III.  Discussion

### A.  Claims Against NWACC

Gidney believes she was illegally fired by NWACC for having threatened to file an ADEA claim and for having engaged in speech protected by the First Amendment. She also alleges that her termination violated her due process rights guaranteed by the Fourteenth Amendment. After careful consideration, the Court finds that none of these claims are cognizable against NWACC because it is entitled to sovereign immunity from suit.

The Eleventh Amendment to the Constitution "immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action." *Hadley v. N. Ark. Cmty. Technical Coll.*,

-10-

76 F.3d 1437, 1438 (8th Cir. 1996), *cert. denied*, 519 U.S. 1148 (1997).  It is clear that a retaliation claim brought pursuant to the ADEA does not override Eleventh Amendment immunity.  *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91-92 (2000) ("[I]n the ADEA, Congress did not validly abrogate the States' sovereign immunity to suits by private individuals.  State employees are protected by state age discrimination statutes, and may recover money damages from their state employers, in almost every State of the Union.  Those avenues of relief remain available today, just as they were before this decision.").  Furthermore, it is equally clear that § 1983 claims arising from alleged violations of an employee's constitutional rights are similarly barred by Eleventh Amendment immunity when asserted against a state employer.  *See Quern v. Jordan*, 440 U.S. 332, 348 (1979) (holding that Congress did not abrogate Eleventh Amendment immunity of the States in passing §1983).

The Court is persuaded that NWACC "'is to be treated as an arm of the state'" rather than "'a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.'"  *Hadley*, 76 F.3d at 1438 (quoting *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).  The Eighth Circuit in *Hadley* set forth the test that district courts are to apply when considering whether a community college is entitled to Eleventh Amendment immunity.  That test involves "'examin[ing] the particular entity in question and its powers and characteristics as created by state law to determine whether the suit is in reality a suit against the state.'"  *Id.* at 1439 (quotation and citation omitted).  To that end, courts must look at three factors: (1) the community college's makeup and characteristics conferred by state law; (2) "the degree of local autonomy and control" to

which a community college is subject; and (3) "whether the funds to pay any award will be derived from the state treasury." *Id.*

NWACC, like the community college analyzed and granted immunity in *Hadley*, is partially funded by local tax revenues; however, the uncontroverted material facts relating to NWACC's powers and characteristics, degree of local autonomy and control, and method and sources of funding demonstrate that it must be considered an arm of the State of Arkansas. The Eighth Circuit has made clear that "[t]he relevant funding inquiry cannot be whether [the community college] enjoys some non-state funding . . . because then most state departments and agencies, and all state universities, would be denied Eleventh Amendment immunity." *Id.* at 1441. Rather, the inquiry must be fact-specific and delve into the particulars of the control and oversight exerted over the community college by the State. The court's goal in conducting this analysis is to determine whether the cause of action asserted against the community college "is in essence one for recovery of money from the state." *Id.* (quotation and citation omitted). If so, then the community college is not subject to suit.

The Court had an opportunity to question the parties' counsel at the summary judgment hearing and confirm whether certain facts set forth in detail in the briefs were, or were not, actually in dispute. The Court can now state with certainty that the first two *Hadley* factors—which consist of inquiries into the makeup and characteristics of the community college as conferred by state law and the degree of local versus state control over community college operations—weigh decisively in favor of granting immunity to NWACC. During the hearing, the Court questioned Gidney's attorney regarding whether

there existed any proof to counter the proof submitted by NWACC "as to the extent of state control over decision-making at Northwest Arkansas Community College," and Gidney's counsel responded, "I don't think there's really much we can point to."

Indeed, the Arkansas legislature has defined "any . . . institution of higher learning, including colleges, universities, and vocational-technical schools" as a "state agency." Ark. Code Ann. § 22-2-102(5).  Furthermore, as a member of the Arkansas Technical and Community College System, NWACC is subject to various state appropriations statutes and regulations.  Gidney does not dispute the veracity of the following facts related to state regulation of NWACC's operations:  (1) all NWACC vehicles bear the State of Arkansas decal and must comply with Department of Finance and Administration acquisition rules and regulations; (2) Arkansas State Building Services must approve any NWACC lease agreement; (3) the State Office of Accounting recommends improvements to the NWACC account system; (4) NWACC is required to report its expenditures to the Arkansas Administrative Statewide Information System; (5) acquisitions of real estate must be approved by the State before action can be taken, and dispositions of real estate must be approved by the Governor's office; (6) the State, through the Arkansas Department of Higher Education, views all of the funds in NWACC's unrestricted budget as state funds under the control of the various state financial processes; (7) approximately 75-80% of the NWACC budget is devoted to personnel, every facet of which is controlled by either the Arkansas Department of Higher Education or OPM; (8) expenditures of all funds, regardless of source, are restricted by state law, and NWACC is required to follow all state purchasing rules and regulations; and (9) any judgment rendered against NWACC would be funded from the unrestricted operating budget as opposed to any other source of

-13-

funds.[4]

Though the first two *Hadley* factors point to a finding of sovereign immunity for NWACC, the last factor—whether the funds to pay any award will be derived from the state treasury—is arguably the most important consideration in the analysis.  NWACC admits that any payment of damages in this case would be made from its unrestricted operating budget. (Doc. 33-3).  As of fiscal year 2013,[5] the operating budget was derived as follows: 13.7% was funded by a continuing local millage levy of 2.6 mills; 26.8% was provided by state revenues; and the remaining 59.5% was provided by other sources, such as tuition and fees.  *Id.*

Under these facts, the Court is persuaded that any judgment paid to Gidney would ultimately derive from state funds.  It is impossible to separate local money from state money within the operating budget as a whole, so a payment to Gidney cannot reasonably be considered to be exclusively funded by local dollars—or even mostly funded by local dollars.  The combination of state funding plus tuition and fees constitutes approximately 85% of NWACC's operating budget derived from unrestricted revenue.  (Doc. 33, p. 8).  This is a significant factor in the analysis.  Furthermore, the *Hadley* court considered the "source of funds" issue and reasoned that while it may be relevant "whether a judgment against the University *can* be paid from non-state funds under the University's discretionary

---

[4] Gidney herself had the opportunity to observe firsthand the nature of the State's operational control over NWACC's basic personnel decisions.  When Gidney lobbied the State in 2011 to request that her job description be amended to reflect her actual responsibilities, the State rejected the proposal even though it was backed by top administrators at NWACC, including the college's President.

[5] Data from fiscal years 2011 and 2012 were also provided for the Court's reference.  All three fiscal years yielded approximately the same ratio of local to state funding.

control, traditional Eleventh Amendment cases did not require a speculative analysis of whether a college largely funded by the State might be able to pay a judgment in the first instance from other revenue sources . . . ." *Hadley*, 76 F.3d at 1440-41 (internal quotation and citation omitted). Instead, the proper focus of a district court's inquiry into the source of funding should be on whether "the State has created an institution of higher learning 'that is dependent upon and functionally integrated with the state treasury,'" *id.* at 1441 (citing *Kashani v. Purdue Univ.*, 813 F.2d 843, 846 (7th Cir. 1987), *cert. denied*, 484 U.S. 846 (1987)), not whether a community college that has otherwise "made its daily operations financially dependent upon the state treasury" has exercised its authority "to supplement . . . [the] operating budget with limited local tax revenues . . . ." *Id.*

The Court's opinion as to NWACC's immunity is further bolstered by the fact that all other district courts that have examined the same issue with respect to present-day Arkansas community colleges have applied the reasoning in *Hadley* and determined that immunity is proper. *See, e.g., Reed v. Coll. of the Ouachitas*, 2012 WL 1409772, *5 (W.D. Ark. April 23, 2012) (finding that community college organized similarly to the North Arkansas Community Technical College ("NACTC") in *Hadley* was a "state agenc[y] for purposes of budgeting and regulating the expenditures of cash funds"); *Rush v. Perryman*, 2007 WL 2091745, *3 (E.D. Ark. July 17, 2007) (granting immunity after observing that "Ozarka College was established and receives funds through the same state laws that govern the NACTC [in *Hadley*]"), *aff'd on other grounds*, 579 F.3d 908 (8th Cir. 2009); *Short v. Westark Cmty. Coll.*, 347 Ark. 497, 507-08 (Ark. 2002) (applying *Hadley* test and finding that Westark Community College, which was organized and funded analogously to

-15-

the NACTC in *Hadley*, was immune from suit, even though "it receives money for general operating expenses from sources other than the State treasury").

If anything, the degree of state regulation and control over Arkansas community college governance appears to have dramatically increased in the fourteen years since *Hadley* was decided. Nevertheless, Gidney argues that the issue of NWACC's Eleventh Amendment immunity may be summarily decided by reference to a case decided by this Court more than 20 years ago—and prior to the holding in *Hadley*—*Parsons v. Burns*, 846 F.Supp. 1372 (W.D. Ark. 1993). In *Parsons*, the Honorable H. Franklin Waters determined that, according to the facts before him at that time, NWACC was not entitled to Eleventh Amendment immunity from suit. However, a review of the factual record before Judge Waters demonstrates how different the governance of NWACC was when the case was decided in 1993 as compared to the present day. For example, with regard to the issue of state control, Judge Waters was persuaded in *Parsons* that

> In comparison to the University of Arkansas and the University of Central Arkansas the community college is significantly more autonomous. For instance, NWACC has the power to tax, is governed by a local elected board with the supervision of a state board rather than being directly governed by a board appointed by the governor, and has the power to acquire, own[,] lease, use and operate property while all property acquired by the state Universities is itself titled in the name of the state.

*Parsons*, 846 F. Supp. at 1380. However, as previously discussed, it appears that nearly all of the above indicia of NWACC's autonomy that Judge Waters relied upon no longer

apply to NWACC's operations today.  The parties agree that NWACC now needs state approval before it may acquire, own, lease, use, and operate property.  Furthermore, despite the existence of a local governing board, NWACC's ability to expend its own funds—regardless of the source—is restricted by state law in all respects, since NWACC is required to follow state purchasing rules and regulations before making any spending decisions. Any shortfall in the operating fund caused by the payment of a judgment would have to be replenished by the State according to statute.  Ark. Code Ann. § 6-61-601(a) ("Funds for the general operation of an adequate comprehensive education program shall be provided by the state."); *cf. Hadley*, 76 F.3d at 1441 ("[E]ven if [the college] could initially satisfy a judgment from other operating revenues, such as tuition payments or federal grants, the judgment would produce a higher operating budget shortfall that must, by state law, be satisfied by an appropriation from the state treasury.").

In 1993 when Judge Waters ruled against NWACC and found that it was not an arm of the State, "20.2% of [NWACC]'s budget [was] provided by state funds and 33.3% [was] provided by local taxes." *Parsons*, 846 F. Supp. at 1379.  This fact, coupled with all the previously-cited indicators of local control over NWACC's governance and expenditures, persuaded Judge Waters to conclude that no sovereign immunity existed.  However, those statistics are not relevant today, as the allocation of state versus local funding for NWACC is the opposite of what it was in 1993, with the percentage of state funds in the operating budget constituting more than double the percentage of funds provided by local taxes. (Doc. 33-3).

Interestingly, Judge Waters was also the district court judge who made the original rulings that were appealed in the *Hadley* case.  Judge Waters had denied Eleventh

-17-

Amendment immunity to NACTC, the Arkansas community college in *Hadley*, in reliance on his reasoning in *Parson*s.  *See Hadley v. N. Ark. Cmty. Technical Coll.*, 56 F.3d 68, *1 (8th Cir. 1995) (per curiam) ("*Hadley I*").  The Eighth Circuit determined that the facts analyzed in *Parsons* when applied to NWACC were not specific enough or analogous enough to allow the district court to simply adopt the *Parsons* reasoning and conclusions without further analysis.  The Eighth Circuit's initial order, which this Court will refer to as *Hadley I*, noted that *Parsons* "heavily relied" upon the fact that the overall budget of NWACC was composed of 20.2% state funds and 33.3% local taxes; whereas the budget for NACTC in Hadley was composed of 58.2% state funds and 3% local taxes.  *Id.* Moreover, NACTC averred more specifically that its unrestricted operating budget, which would be the fund used to pay any judgment, was composed of 75% state funds, and "[s]uch factual allegations were not considered in the *Parsons* opinion."  The Court of Appeals in *Hadley I* retained jurisdiction over the appeal and certified the question back to the district court to prepare a complete factual record.  *Id.* at *2.

It appears that when Judge Waters conducted the factual inquiry directed by the Court of Appeals in *Hadley I*, his opinion as to the sovereign immunity of NACTC changed completely, and he reversed his decision, determining that the community college was, in fact, entitled to Eleventh Amendment immunity.  *Hadley*, 76 F.3d at 1438 ("*Hadley II*"). *Hadley II*, which the Court has cited to extensively above, was an appeal of Judge Waters' decision to grant immunity, rather than deny it, and the Eighth Circuit affirmed his decision. The precedential value of *Parsons*, even though it discusses the immunity of the same community college at issue in the case at bar, is therefore called into question in light of

the procedural history in *Hadley I* and *Hadley II*.   In any event, the fact-intensive analysis of NWACC's governance and funding, which the Court has endeavored to conduct in this opinion, indicates that NWACC is an arm of the State, and Eleventh Amendment immunity is proper.  All claims against NWACC are therefore dismissed with prejudice.

### B.   Claims Against Paneitz and Cadle

#### 1.   Official-Capacity Claims

Gidney also sues two employees of NWACC, former President Rebecca Paneitz and current Director of Human Resources Wendi Cadle, pursuant to § 1983 for alleged violations of Gidney's First and Fourteenth Amendment rights.  As an initial matter, the Court finds that claims against state employees in their official capacities are not cognizable, to the extent that such claims seek to recover money damages.  This is because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." *Id.* (internal citation omitted).

Accordingly, just as the State is immune from suit for claims which would implicate the state treasury, state officials are also immune from suit "if immunity will protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself." *Hadley*, 76 F.3d at 1438 (internal quotation and citation omitted). Therefore, to the extent that Gidney asserts claims for monetary relief against Paneitz and Cadle in their official capacities, those claims are

dismissed with prejudice.

With regard to Gidney's non-monetary request for reinstatement to her former job, the Court of Appeals has found that, according to the Supreme Court's holding in *Ex parte Young*, 209 U.S. 123 (1907), such a claim is potentially cognizable against state officials in their official capacities, regardless of the sovereign immunity conferred upon the officials' employer. *Treleven v. Univ. of Minn.*, 73 F.3d 816, 819 (8th Cir. 1996) (reversing district court's grant of summary judgment to state official based on Eleventh Amendment immunity analysis, with respect to claim for injunctive relief in the form of reinstatement only); *Rush*, 2007 WL 2091745 at *3 (finding that, although a plaintiff may not pursue a claim for front pay against a state official otherwise protected by sovereign immunity, the plaintiff is free to pursue a non-monetary claim for reinstatement pursuant to the holding in *Ex parte Young*), *aff'd on other grounds*, 579 F.3d 908 (8th Cir.2009).

That said, "*Young* applies only where the underlying authorization upon which the named official acts is asserted to be illegal." *Papasan v. Allain,* 478 U.S. 265, 277 (1986). Here, assuming the facts in the light most favorable to Gidney, a reasonable fact-finder could not conclude that official acts taken by either Paneitz or Cadle were illegal or otherwise caused Gidney to be deprived of any of her constitutional rights.  In order to determine whether state officials are shielded from § 1983 liability due to the doctrine of qualified immunity, the Supreme Court has set forth a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  The two steps are: (1) determining whether the plaintiff has alleged a deprivation of a constitutional right at all; and (2) determining whether the right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223,

232 (2009).  District courts are afforded discretion as to whether to address the two steps sequentially or skip directly to the second step while assuming that a constitutional deprivation did, in fact, occur. *Id.* at 236.  As to the second step in the analysis, a right is "clearly established" for qualified immunity purposes if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Considering the undisputed facts in the instant case, the Court finds that Gidney has failed to allege a deprivation of any constitutional right.  Beginning with Gidney's First Amendment claim, Gidney speculates that at the time Paneitz approved her termination, Paneitz knew that Gidney had made a FOIA request regarding NWACC's hiring practices and also knew that Gidney planned to make an EEOC complaint on the basis of age discrimination.  As to Cadle, Gidney similarly offers no more than mere speculation that Cadle knew about Gidney's intention to file an EEOC complaint.

A plaintiff cannot survive a motion for summary judgment unless she is able to "substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy." *Habib v. NationsBank*, 279 F.3d 563, 567 (8th Cir. 2001) (citing *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir.1995)).  Furthermore, in order to establish causation with respect to a retaliation claim, a plaintiff must first show that the decision-makers had some awareness of the protected activity.  *Robinson v. Potter*, 453 F.3d 990 (8th Cir. 2006) ("Her assertions the committee must have known because some members of HR knew about the complaint are insufficient.").

-21-

Here, Gidney admitted in her deposition that she could only speculate as to Paneitz and Cadle's knowledge of her intent to file a complaint with the EEOC.  (Doc. 15-2, pp. 78-79, 91-92).  She further speculated that when she "questioned stuff like with the FOIAs," she was put on Cadle's "problem child list."  *Id.* at p. 92.  Such speculation is insufficient to survive summary judgment and state a claim for the deprivation of a constitutional right.[6]

With respect to Gidney's Fourth Amendment claim, the Court notes that she has specifically abandoned her substantive due process argument and rests only on her procedural due process argument.  *See* Doc. 17, p. 9.  Establishing a procedural due process claim is a two-step inquiry. "Initially a plaintiff must prove the state deprived him of some life, liberty, or a property interest."  *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902 (8th Cir. 2000).  Next, "[i]f successful, the plaintiff must then establish that the state deprived [her] of that interest without sufficient process."  *Id.* Gidney cannot show a procedural due process violation here because she had no property or liberty interest in her continued employment at NWACC, and even if she did, she was not denied the post-termination process available to her.

Gidney maintains that she had a property interest in her employment at NWACC because she had a one-year employment contract.  Her proof of the existence of a contract

---

[6] To the extent that Gidney's April 2011 letter to the Attorney General also forms the basis of her First Amendment retaliation claim, this letter was written fifteen months prior to her termination.  A temporal gap such as this "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir.1999) (citation omitted).  Furthermore, despite Gidney's speculation that Paneitz "harbored some ill feelings toward [her]" as a result of the 2011 letter (Doc. 15-2, p. 91), Gidney's counsel argued at the summary judgment hearing that "the most recently occurring protected activity"—namely, the EEOC complaint and FOIA request—forms the true basis of Gidney's First Amendment claim.

is a document she received, dated July 2, 2012 (Doc. 17-4), which states as follows:

> This is a notification of a change in the terms and conditions of your appointment at Northwest Arkansas Community College.    This notice reflects your fiscal year 2012-13 renewal.
>
> Effective July 1, 2012 your position as Accountant Fixed Assets is renewed.
>
> The duration of your contract is effective July 1, 2012 through June 30, 2013.

*Id.*

NWACC responds that, notwithstanding the word "contract" in this document, it is not a valid employment contract, and Gidney was an at-will employee.  The Court agrees and finds that this document on its face appears to be a notice rather than a contract. It merely informs Gidney, a state employee, that the State funded her position for the coming fiscal year.

At the hearing on summary judgment, the Court attempted to clarify Gidney's position on the issue of the existence of a contract by engaging her attorney, Mr. Hall, as to why Gidney believed that only she, out of all other classified state employees of NWACC, possessed an employment contract:

> The Court:     Well, it says "the duration of your contract as effective July 1, 2012 through June 30th of 2013." The community college says, you know, yes, it says quote/unquote "contract," but poor choice of words.  This just simply means that the position, the classified position has been renewed for that period of time, i.e., we have funding for that position.  It's not saying that Ms. Gidney is, by contract, entitled to that position.
>
> . . .

-23-

Mr. Hall:        Yeah.  Obviously we disagree.  We would argue that that letter is clear evidence of the existence of a contract.  Of course, that letter itself is not the contract, but it's a reference to the contract.

The Court:     Where's the contract?

Mr. Hall:        We don't know.  It may not be a written contract.  We haven't been able to find one.  They haven't produced one.

The Court:     So are you saying that all classified employees in the State of Arkansas have verbal employment contracts that are not subject to termination at will?

Mr. Hall:        I could only speak to this particular instance.  Here it looks like there's a contract being referenced that explicitly states it exists for a term of one year.

The Court finds, after considering Gidney's counsel's arguments and analyzing the document Gidney claims is a contract, that this document is not a contract at all, but a notice pertaining to the funding of her job by the State.  Although Gidney suggests that a true employment contract exists, at best this contention is pure speculation.  There is no credible evidence to indicate Gidney was anything other than an at-will employee and, therefore, could be terminated by NWACC for any reason or for no reason at all.  Accordingly, she had no property right in her continued employment and no constitutionally protected interest in her job.

As for Gidney's belief that she was denied sufficient post-termination process and

consequently suffered extreme damage to her professional reputation,[7] NWACC has submitted proof that: (1) Gidney was entitled to, but never requested, a name-clearing hearing after her termination, as set forth in the NWACC Procedures Manual; (2) the Manual was accessible on the shared "K" drive of the computer and in administrative offices of NWACC; (3) Gidney accessed the Manual on the NWACC website in the past; (4) she obtained a copy of the Manual on a flash drive sometime after November 10, 2011; and (5) at the time of her termination, she told Hill and Wilhelm, "If you're going to fire me, just do it. Get it over with. I'm tired of this." (Doc. 15-2, p. 75). Considering these facts, and in the absence of any other allegations in support of her Fourteenth Amendment claim, there is no credible evidence that Gidney's rights were violated through the denial of post-termination remediation procedures.

Since Gidney has failed to show a deprivation of her constitutional rights in the first place, all official-capacity claims for non-monetary relief as to Paneitz and Cadle are subject to dismissal with prejudice. Even if the Court were to reach the second step of the qualified-immunity analysis by assuming that Gidney's constitutional rights were somehow implicated by her termination, the contours of those rights were not sufficiently clear that an official in Paneitz or Cadle's position would have understood that terminating Gidney would have violated such rights. Gidney failed to refute NWACC's proof that Paneitz and Cadle had a reasonable and good-faith basis for terminating her for cause due to her failure to complete the asset-disposal project. As the qualified immunity standard operates to protect "all but the plainly incompetent or those who knowingly violate the law," *Malley*

---

[7] Gidney does not allege that any Defendant made public statements concerning the reasons for her termination.

*v. Briggs*, 475 U.S. 335, 343 (1986), Paneitz and Cadle would certainly be entitled to qualified immunity.

## 2. Personal-Capacity Claims

With regard to Gidney's claims against Paneitz and Cadle in their personal capacities, these sorts of suits "seek to impose individual liability on a government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Unlike official-capacity suits, which "'generally represent only another way of pleading an action against an entity of which an officer is an agent,'" *id.* (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978)), "to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right," *id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

As discussed above, Gidney failed to establish that Paneitz or Cadle took any action or made any omission that resulted in the violation of Gidney's federal rights. Accordingly, Gidney's personal-capacity claims against Paneitz and Cadle are dismissed with prejudice.

## IV. Conclusion

The Court finds that Defendants' Motion for Summary Judgment (Doc. 14) is GRANTED. The Complaint is DISMISSED WITH PREJUDICE, and judgment in Defendants' favor will be entered contemporaneously with this Order.

IT IS SO ORDERED this 29th day of May, 2014.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

-26-